By the Court, Ingalls, J.
At the Oyer and Terminer, held in and for the county of Columbia, in April, 1866, Barney McCann was tried and convicted of the murder of Edward Pye. The prisoner, with several others, met at the house of one Mrs. Eiley and indulged in drinking liquor. Pye was present, and a dispute arose between him and the prisoner in relation to some tobacco. The witnesses agree that McCann asked Pye for a chew of tobacco, which was refused. One witness states that Pye, in answer to the request, said, “I would sooner hit you in the face than give you a chew.” Another witness gives the- following version : 11 Pye said, Wo, you dirty Irish son of a bitch, get on to the floor and I can lick you.” Immediately after these words, Pye struck McCann and knocked him nearly or quite down, and McCann got up and immediately rushed towards Pye, making a thrust with a knife, which inflicted the fatal wound. The evidence shows clearly that the whole transaction occurred within a few moments, and that McCann could not have advanced more than six or eight feet when he administered the blow with the knife. Shaffer, a witness for the prosecution, testifies: “ The whole transaction occurred in about a minute; it was all right along.”
Stafford, another witness for the people, testified: “Did not see McCann fall; he went back three or foiir paces, and the next I saw, I saw him (McCann) coming with a knife. This was but a few moments after Pye struck McCann.” It is apparent that McCann was in a violent passion, amounting to a paroxysm of anger, induced by the insult *623 ing language of Pye, accompanied with a severe blow, which nearly or quite prostrated the prisoner. The evidence shows that the attack by Pye was wholly unprovoked by the prisoner, and that the injury was inflicted by McCann while he was in the heat of passion; induced by sudden, violent .and unjustifiable provocation. Under such circumstances it is unreasonable to conclude that time had elapsed sufficient for passion to cool, and reason to regain control, so that a premeditated design to take the life of Pye could have been formed; which is indispensable to constitute the crime of murder in the first degree. We are inclined to the conclusion that the prisoner might with propriety have been convicted of manslaughter in the third degree. Certainly not murder in the first degree. It may be well to examine some of the authorities bearing upon the questions presented, with a view to arrive at a correct conclusion in regard to the grade of crime which the evidence shows was committed {Wharton on Homicide,p. 35). “ Manslaughter at common law is of two kinds : 1st. Voluntary manslaughter, which is the unlawful killing of another without malice, on sudden quarrel or in heat of passion. When upon sudden quarrel two persons fight, and one of them kills the other, that is voluntary manslaughter. And so if they upon such occasion go out and fight in a field, for this is one continued act of passion. So, if a man is greatly provoked by any gross indignity, and immediately kills his aggressor, it is voluntary manslaughter, and not excusable homicide, not being se defendendi; neither is it murder, for there is no previous malice. In these and such like cases the law, kindly appreciating the infirmities of human nature, extenuates the offense committed, and mercifully hesitates to put on the ' same footing of guilt the cool deliberate act and the result of hasty passion.”
( Wharton’s Criminal Law, § 922, fourth edition). ‘ ‘ Where the defendant, having been violently beaten and abused. *624 ran to his house, eighty rods, got a Tcnife, ran back, and on meeting the deceased stabbed him, it was held but manslaughter.”
(§190.) “If on receiving such a deadly assault, he suddenly leave the scene of outrage, procure arms and in the heat of blood consequent upon the wrong, return and renew the combat and slay his adversary, both being armed, such a homicide would be but manslaughter. For the law from its sense of, and tenderness towards human infirmity, would consider that sufficient time had not elapsed for the blood to cool and reason to resume its empire over the mind smarting under the original wrong."
(§ 987.) “ Where death ensues, in heat of blood on immediate provocation, therehaving been no previous malice, the offense is manslaughter.”
(Same section.) “The indulgence which the law extends to cases of this description is founded on the supposition that a sudden and violent exasperation is generated in the affray so as to produce ar temporary suspension of reason— and that the transport of passion excludes the presumption of malice."
(Wharton on Homicide, page 186.) “ Any assault in general, made with violence or circumstances of indignity upon a man's person, if it be resented immediately by the death of the aggressor, and it appear that the party acted in the heat of blood upon that provocation, will render the crime manslaughter.”
Taunton, J.,
in Taylor's case defines manslaughter as follows : “ Manslaughter—homicide, not under malice, but when the blood is heated by provocation, and before it has time to cool.”
In rex v. Taylor (5 Burrows, 2793), after a quarrel an attempt was made to expel Taylor from the house—and he drew a sword and stabbed Smith, the deceased, and inflicted a mortal wound. The court, after deliberation,, pronounced it manslaughter. That case is often referred *625 to with approbation. In the case of Rogers v. The People (15 Howard, 558), much of the reasoning of the court applies to the case under consideration, and some of the circumstances are similar to those in the case at bar. The homicide was committed under circumstances of much ' less provocation, and there is evidence in the case cited to the effect that only words preceded the fatal blow. In this case there is no conflict in the evidence. All the witnesses agree in saying that words and blows constituted the provocation. Judge Sutherland, in the case cited, remarks: “If the prisoner struck the fatal blow in the heat of passion, without the intention or design to kill, he was guilty of one of the degrees of manslaughter.” Again: “But the violent homicide for which the prisoner was tried had different degrees, depending on the intent to kill, or the absence of such intent. The statutory definition of two of the degrees of manslaughter implies, not only that a homicide committed in the heat of passion may have been committed without the intention to Mil; but that also such heat of passion is likely to prevent the reasoning, calculation, reflection or design implied by a particular intent.”
(The People v. Johnson, 1 Park. Cr. Rep., 291.) In this case the prisoner and the deceased engaged in a fight in the public highway, and the prisoner knocked the deceased down, and then took a large stone from a wall, and with both hands threw it upon the head of the deceased, breaking the skull and causing death. The prisoner was convicted of murder, and such conviction was reversed, and the reasoning of the court shows conclusively that the crime was regarded manslaughter and not murder. Barculo, J., says: “We suppose that an erroneous impression may thus have been produced upon the minds of the jury. We consider the second subdivision wholly inapplicable to a case where there is reason to believe that the killing was in the heat of passion, for *626 such killing never was murder at the common law, and the revisers did not- intend to increase the cases of murder.” This remark of the learned judge bears with force upon the case at bar. In the People v. Clark (7 N. Y., 385), the court recognize the distinction between cases where there is a provocation and heat of passion, and where those features do not exist, in determining the grade of crime. The court say: “In the case before us, there was no provocation, no mutual combat, no heat of passion which the law can recognize.” Turning to the case at bar, we find all these features—mutual combat, gross provocation, and consequent heat of passion without time for such passion to cool, before the fatal thrust. The parties did not separate from the commencement until the termination of the affray. How can it be reasonably contended, under such circumstances, that there could be premeditation? If not, the case is wanting in an indispensable element to constitute the crime of which the prisoner was convicted. The jury must have misconceived the directions which they received from the court, for upon no •other reasonable hypothesis can we account for their verdict, which is in direct conflict with the facts proved, and the law which was correctly pronounced by the learned justice. There accompanied the verdict positive evidence of the reluctance with which it was rendered, in the written communication containing an unusually urgent appeal on behalf of the prisoner for the exercise of executive clemency. The judicial mind cannot apply the law to the undisputed facts of this case, and fail to be convinced that the prisoner has been convicted of a crime of which he was not guilty, and which stands wholly unproved against him. It might be insisted, certainly at least with plausibility, that the facts proved reduce the offense to manslaughter in the third' degree, as defined by section 12, •page 940, vol. 3, Revised Statutes, fifth edition, which is as follows: “ The killing of another in the heat of passion, *627 without a design to effect death, by a dangerous weapon, in any case except such wherein the killing of another is herein declared to be justifiable or excusable, shall be deemed manslaughter in the third degree.”
It is not pretended that there is evidence of express malice, and in my judgment it cannot be implied from the facts proved, and the law applicable thereto. And hence the design to effect the death of the deceased, as contemplated by the statute referred to, did not exist. Foster, in defining what constitutes implied malice, says: “And I believe that most, if not all, the cases which in the books are ranged under the head of implied malice, will, if carefully adverted to, be found to turn upon this single point: that the fact hath been attended with such circumstances as carry in them a plain indication of a heart regardless of social duty, and fatally bent on mischiefP There is not a fact in the whole case which proves the existence of those qualities in the prisoner. All who testify as to his general character and demeanor, speak favorably, and the history of the fatal affray shows that he was not the aggressor.
In the People v. Johnson (1 Park., 291), Barculo, J., says: “Thus it appears that by the terms of the statute the killing of a human being, in three specified cases, is murder, unless it falls within some of the inferior classes of homicide, from which we deduce the inference that if a case comes within any degree of manslaughter, it cannot be deemed murder, although it is accompanied by some of the circumstances which make up the latter crime”
The fact that the prisoner used a knife and death ensued," does not necessarily raise the presumption of malice, or that within the meaning of the statute there existed the design to effect the death of the deceased. This has been shown by the authorities which have been cited. When we reflect that there was a violent provocation, and almost instantaneously thereupon the fatal injury was inflicted by the prisoner, we may properly hesitate before declaring that *628 the prisoner’s crime was not manslaughter in the third degree. It is, however, only necessary to satisfy ourselves whether or not the prisoner was guilty of murder in the first degree, and the other considerations are only important so far as they aid in determining that question, except possibly they may furnish some guide in a future trial. The reflection that the life of a human being is even jeoparded by the verdict of a jury, erroneously, although conscientiously, rendered, is revolting to every sense of justice and dictate of humanity, and calls upon the court to interpose on behalf of the prisoner, to the extent of its power, in the exercise of judicial discretion. It is said by counsel, in substance, that it was the province of the jury to determine whether there existed a premeditated design to effect the death of the deceased, and having rendered a verdict which implies such finding, this court is powerless to grant relief, although satisfied that such verdict stands unsustained by any evidence which even tends to prove the crime. We cannot give our assent to such a proposition. Suppose the jury had rendered a verdict in this case, pronouncing the prisoner guilty of treason, this court would not, I apprehend, hesitate a moment to set aside v such a verdict, and order a new trial. It may be said the case put is a strong one, and improbable—nevertheless it tests the power of the court to interpose, in the exercise of that general control which it possesses over its own records and proceedings. Conceding that the case is not unproved in every particular which enters into a conviction for the crime of murder, and yet the case is wanting in one indispensable element to constitute the crime, and that too which distinguishes murder from manslaughter, and upon which depended the life of the prisoner, viz: the premeditated design to take life. The record which we are to examine purports to contain all the evidence and proceedings had and taken upon the trial, and from it we perceive that the learned justice charged the jury, among *629 other things,, that to constitute the crime of murder there must be some deliberation and ' premeditation preceding the act. That if in the heat of passion a man strikes a blow without intending to kill, and death follows, then it is manslaughter in the third degree. These instructions, as has been before remarked, were probably misconceived, by the jury, and as a consequence they rendered a verdict unauthorized by the law and facts of the case. If there were some evidence which tended to show premeditation, so that a conflict in the evidence was produced, a very different question would be presented for our determination. In this case the proposition is presented—whether, where a prisoner is convicted by the verdict of a jury upon undisputed evidence of a crime involving his life, and an indispensable element to constitute such crime is unsupported by any evidence tending to prove the same, this court has the power to grant a new trial. We are of opinion that such power exists, and that a case is presented where it should be exercised. (Hilliard on New Trials, page 353, § 36.)
It is really the determination of á question of law upon undisputed facts, where there is a clear failure of proof upon a material point, and not the ordinary application to set aside a conviction on the ground that it is against the weight of evidence. In Davis v. Spencer (24 N. Y., 390), Allen, J., remarks: “If there was no evidence the decision would be clearly erroneous in law.” This case has been considered upon the assumption that no error was committed by the learned justice, either in his charge to the jury, or in any ruling upon the trial. We are clearly of opinion that the conviction should be reversed and a new trial ordered.
Mzller and Hogeboom, JJ., concurred in the result.